Karen SAMPLES, Plaintiff,

v.

FIRST HEALTH GROUP CORP., et al., Defendants.

No. CIV 05–2028 PHX RCB.

United States District Court, D. Arizona.

July 24, 2007.

Elliot Spencer Isaac, Elliot S. Isaac PC, Phoenix, AZ, for Plaintiff.

Keith F. Overholt, Ronald D. Roach, Jennings Strouss & Salmon PLC, Phoenix, AZ, for Defendants.

## ORDER

ROBERT C. BROOMFIELD, Senior District Judge.

This matter arises out of an action brought pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132, by Plaintiff Karen Samples to challenge the rejection of her claim for additional director-level severance benefits under the First Health Group Corp. Severance Pay Plan (the "Plan") following her termination through a reduction in work force. After her denial of benefits, and an unsuccessful appeal, Plaintiff filed a Complaint (doc. # 1) on July 8, 2005 against Defendants First Health Group Corp., its subsidiary companies (collectively, "First Health"), and the Plan. Currently before the Court is Defendants' motion for summary judgment (doc. # 23). The motion has been fully briefed. Resp. (doc. # 25); Reply (doc. # 29). The Court finds the matter suitable for decision without oral argument. Having carefully considered the arguments raised by the parties' briefs, the Court now rules.

## I. BACKGROUND

### A. Undisputed Facts

Plaintiff began her employment with First Health on October 4, 1999 as its "Clinical Management Services, Colleague Development Director." Defs.' Statement of Facts ("DSOF") (doc. # 24) ¶ 3. On January 19, 2004, First Health notified Plaintiff that her position was being eliminated effective March 18, 2004 due to a reduction in work force. *Id.* ¶ 4. The letter also informed Plaintiff that, pursuant to the company's then existing severance pay plan, she would be eligible for four weeks of severance pay. *Id.*

### 1. The Plan

On February 16, 2004, First Health notified Plaintiff that it had organized and consolidated a number of its benefit plans, including the aforementioned severance plan. As modified, the Plan provides for the possibility of additional severance benefits subject to the eligibility requirement that the departing employee execute a release agreement.[1] *Id.*; Pl.'s Statement of Facts ("PSOF") (doc. # 26) at 2.

The schedule of benefits under the Plan provides as follows for "persons with the title of Manager or titles below Manager:"

　i.　Minimum severance payment will be four (4) Weeks of Pay;

　ii.　Severance pay will be two Weeks of Pay plus (Year(s) of Service times one Week of Pay);

　iii.　Maximum severance pay will be fifteen (15) Weeks of Pay.

DSOF (doc. # 24), Ex. 2 at 4. For "persons with the title of Director or titles above Director," the Plan provides the following benefits:

　i.　Minimum severance payment will be eight (8) Weeks of Pay;

　ii.　Severance pay will be 4 Weeks of Pay plus (Year(s) of Service times 2 Weeks of Pay);

---

**1.** For eligibility under the Plan, departing employees must "sign a Separation Agreement and General Release with the Company including, in some cases at the discretion of the Company, restrictive covenants in a form satisfactory to the Company." DSOF (doc. # 24), Ex. 2 at 2.

iii. Maximum severance pay will be fifteen (17) Weeks of Pay.

*Id.* at 5. An explanatory footnote clarifies that the phrase "persons with the title of Director or titles above Director" excludes "any position classified as 'non-supervisor' in the Colleague Data Base, such as Medical Director, National Sales Director, or Product Director." *Id.* at 5, n. 1.

As the administrator and fiduciary of the Plan, First Health retains the "sole, absolute discretion over issues or determinations, regardless of the timing of such determination or exercise of discretion." *Id.* at 6. The Plan further provides that

The Plan Administrator shall have the discretion to make any findings of fact needed in the administration of the Plan and will have the discretion to interpret or construe ambiguous, unclear or implied (but omitted) terms in any fashion it deems to be appropriate in its sole judgment. The validity of any such findings of fact, interpretation, construction or decision will not be given a de novo review if challenged in Court, by arbitration or any other forum and will be upheld unless clearly arbitrary and capricious.... If, due to errors in drafting, any Plan provision does not accurately reflect its intended meaning, as demonstrated by consistent interpretations or other evidence of intent, or as determined by the Plan Administrator in its sole and exclusive judgment, the provision will be considered ambiguous and will be interpreted by the Plan Administrator in a fashion consistent with its intent, as determined by the Plan Administrator in its sole discretion.

*Id.*

### 2. Eligibility Determination Regarding Director–Level Benefits

In the Colleague Data Base, Plaintiff's former position is reflected with the title of "director," appearing as "CMS Colleague Dev Dir." DSOF (doc. # 24), Ex. 7 at 3. The supervisory level classification corresponding to that position is "Mgr" (for "manager"), as opposed to "Non–Supv" (for "non-supervisor"). *Id.* The supervisory level classifications for the Medical Director, National Sales Director, and Product Director positions that are referred to in the Plan are also indicated as "Mgr," not "NonSupv." *Id.*

On March 8, 2004, Plaintiff received a memorandum from Iris Sullivan, First Health's Director of Human Resources, summarizing First Health's decision to terminate Plaintiff's position and reviewing the recent changes to the company's severance benefit plan. DSOF (doc. # 24) ¶ 13. Enclosed with the memorandum were two copies of the Separation and General Release agreement required for eligibility under the new Plan. *Id.* The memorandum further explained that, while Plaintiff would still be entitled to a severance package that was presented to her on January 8, 2004, she would have to sign and return the release agreement within 45 days to be eligible for any additional severance benefits under the new Plan. *Id.* ¶¶ 13–14.

On March 18, 2004, the last day of her employment, Plaintiff sent an email to Nancy Zambon, First Health's Vice President of Human Resources, complaining about the information she received from Sullivan who told her that she would not be eligible for director-level compensation under the new Plan due to her title and grade of employment. *Id.* ¶ 15.

On March 19, 2004, First Health issued a check made payable to Plaintiff that included $5,931.20 of severance pay, calculated at Plaintiff's wage rate of $37 per hour, *i.e.,* four weeks of pay. *Id.* ¶ 16.

On April 14, 2004, Plaintiff wrote a letter to Zambon reiterating her demand for director-level benefits under the Plan, and requesting additional time to sign the release. *Id.* ¶ 17.

Plaintiff eventually retained counsel and formally appealed First Health's decision to its Corporate Severance Plan Review Committee (the "Committee"), which responded by letter dated January 12, 2005. *Id.* ¶ 18. The Committee determined that Plaintiff was not eligible for director-level benefits under the Plan, explaining that "[t]he Plan language indicates the intent to differentiate between the level of benefits awarded to a person acting at a director level with a director title and someone who merely has the word 'director' in their title." DSOF (doc. # 24), Ex. 11. The Committee stated that "Footnote 1 to Section 5(c) of the Plan clearly provides that the classification in the Colleague Data Base is the controlling classification for determining which Schedule of Benefits applies when a colleague is eligible for severance benefits." *Id.* Finally, the Committee's letter explained some distinctions that it apparently considered in distinguishing between those "acting at a director level" and those "who merely have the word 'director' in their title." These considerations included the fact that (1) directors accrue Flexible Time Off at a slightly higher rate than other colleagues, (2) directors are required to sign an insider trading agreement, and (3) directors are subject to blackout periods during which they cannot buy or sell First Health stock. *Id.*

### B. Disputed Facts

Plaintiff states that, during her employment, First Health never explained to her that she was a manager and never showed her the Colleague Data Base on which it has apparently relied in making its benefit eligibility determination. PSOF (doc. # 26) ¶ 2. She claims that, in her position as Colleague Development Director, she exercised supervisory responsibilities over her unit's budget, staff, processes, and procedures, and had eight employees reporting to her. *Id.* ¶ 5. In addition, she states that she attended director-level meetings, was responsible for strategic and long-term planning, recommended who would receive stock options and the number of options to be awarded, and, unlike managers who worked in cubicles, worked in an office with a view. *Id.* ¶¶ 6–9. First Health does not dispute these facts, but maintains that it is irrelevant whether potential plan beneficiaries can see the Colleague Data Base or exercise any seemingly supervisory responsibilities, because the Plan vests "sole and absolute discretion" in the Plan Administrator to make benefit eligibility determinations. Defs.' Supplemental Statement of Facts ("DSSOF") (doc. # 30) ¶¶ 2, 5.

In her affidavit, Plaintiff also states that Sullivan, First Health's Director of Human Resources, initially told her that she thought Plaintiff had been incorrectly classified as a manager, rather than a director, for purposes of severance benefits under the Plan. PSOF (doc. # 26) ¶ 11. She states that Sullivan had said that she should receive director-level benefits. *Id.* ¶ 12. First Health apparently believes that these statements are contradictory to Plaintiff's deposition testimony that Sullivan had told her that she felt First Health had misapplied the plan, and that she felt Plaintiff was actually eligible for director-level benefits.[2] DSSOF (doc. # 30) ¶¶ 7–8. First Health also believes that Sullivan's opinions are immaterial on account of the "sole and absolute discretion" vested in First Health under the Plan. *Id.*

Plaintiff notes that the Plan does not define the terms "director," "manager," "supervisor," or "non-supervisor," PSOF (doc. # 26) ¶ 18, but First Health main-

---

**2.** The Court does not fully appreciate the genuineness of this "dispute," but, in the adver- sarial spirit exhibited by First Health, will note the matter as being hotly contested.

tains that this, too, is immaterial by virtue of its "sole and absolute discretion" under the Plan. DSSOF (doc. # 30) ¶ 13.

Finally, Plaintiff contends that she was subject to blackout periods for the purchase and sale of First Health stock, was periodically reminded of such blackout periods throughout the term of her employment, and that she did sign an insider trading agreement. PSOF (doc. # 26) ¶¶ 19–20. First Health disputes these allegations. DSSOF (doc. # 30) ¶ 14. ...

## II. STANDARD OF REVIEW

Summary judgment is appropriate "when there is no genuine issue of material fact" such that "the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56. In determining whether to grant summary judgment, a district court must view the underlying facts and the inferences to be drawn from those facts in the light most favorable to the nonmoving party. *See Matsushita Elec. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

If a party will bear the burden of proof at trial as to an element essential to its claim, and fails to adduce evidence establishing a genuine issue of material fact with respect to the existence of that element, then summary judgment is appropriate. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Not every factual dispute is capable of defeating a properly supported motion for summary judgment. Rather, the party opposing the motion must show that there is a *genuine* issue of *material* fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A factual dispute is genuine if the evidence is such that a rational trier of fact could resolve the dispute in favor of the nonmoving party. *Id.* at 248, 106 S.Ct. 2505. A fact is material if determination of the issue might affect the outcome of the case under the governing substantive law. *Id.* Thus, a party opposing a motion for summary judgment cannot rest upon bare allegations or denials in the pleadings, but must set forth specific facts demonstrating a genuine issue for trial. *See id.* at 250, 106 S.Ct. 2505. If the nonmoving party's evidence is merely colorable or not significantly probative, a court may grant summary judgment. *See id.* at 249, 106 S.Ct. 2505; *see also Cal. Architectural Bldg. Prods., Inc. v. Franciscan Ceramics*, 818 F.2d 1466, 1468 (9th Cir.1987).

## III. DISCUSSION

First Health argues that there are no genuine issues of material fact that would indicate any abuse of discretion on its part in denying Plaintiff director-level benefits under the Plan, and should therefore be granted summary judgment. The Court will first determine the appropriate standard of review to apply.[3]

---

**3.** First Health argues for the first time in its reply that Plaintiff was ineligible for additional director-level benefits under the Plan, because she did not execute a release. Reply (doc. # 29) at 2–3. Ordinarily, the Court would not consider this argument without providing Plaintiff an opportunity to respond. *Cf. Provenz v. Miller,* 102 F.3d 1478, 1483 (9th Cir.1996) (holding that where a party introduces new evidence in its reply brief, the district court should not consider the new evidence without giving the non-movant an opportunity to respond); *Corson & Gruman Co. v. NLRB,* 283 U.S.App. D.C. 239, 899 F.2d 47, 50 (D.C.Cir.1990) (requiring moving party to raise all arguments in its opening brief to prevent "sandbagging" of opposing party). For purposes of the present motion, it is sufficient to note that, beyond the inferences discussed in its reply memorandum, First Health has not supplied any evidence that Plaintiff has failed to execute such an agreement. Moreover, the Committee's denial of benefits letter, by discussing the terms of the new Plan, suggests that a release may actually have been executed by Plaintiff.

## A. Standard of Judicial Review in § 1132 Actions

Although ERISA creates private rights of action allowing plan participants and beneficiaries to challenge benefit eligibility determinations, the statute does not set out the standard of judicial review for such actions. *See* 29 U.S.C. § 1132. First Health's position is that "[t]he validity of [First Health's] findings of fact, interpretation, construction or decision will not be given a de novo review if challenged in Court ... and will be upheld unless clearly arbitrary and capricious." DSOF (doc. # 24), Ex. 2 at 6.

■ Notwithstanding, the Supreme Court has stated that the determination of the appropriate standard for § 1132 actions should be guided by principles of trust law. *See Firestone Tire & Rubber, Co. v. Bruch*, 489 U.S. 101, 107–111, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). Thus, if a plan confers discretion on its administrator to interpret the plan's terms or to make benefit eligibility determinations, the administrator's decisions are entitled to deference, and are reviewed for abuse of discretion. *Id.* at 111–15, 109 S.Ct. 948. Absent such discretionary authority, however, courts must review the administrator's decisions *de novo*. *Id.* at 115, 109 S.Ct. 948.

■ However, even if a plan administrator has discretionary authority, a court may engage in a more searching review if the administrator's decision was tainted by a conflict of interest. *Id.* "Because the great deference accorded a plan administrator arises in part from the assumption of trust law that the trustee has no pecuniary interest in his decisions, proof that the trustee does have such interest correspondingly strengthens the court's level of review." *Bogue v. Ampex Corp.*, 976 F.2d 1319, 1325, n. 29 (9th Cir.1992). In *Firestone*, the Supreme Court noted that if an administrator is "operating under a conflict of interest, that conflict must be weighed as a factor in determining whether there is an abuse of discretion." *Firestone*, 489 U.S. at 115, 109 S.Ct. 948 (internal quotations omitted). The Ninth Circuit has recently clarified that "*Firestone* ... require[s] abuse of discretion review whenever an ERISA plan grants discretion to the plan administrator, but a review informed by the nature, extent, and effect on the decision-making process of any conflict of interest that may appear in the record." *Abatie v. Alta Health & Life Insurance Co.*, 458 F.3d 955, 967 (9th Cir. 2006) (en banc). This standard applies to the kind of inherent or structural conflict of interest that exists when an insurer acts as both the plan administrator and funding source for benefits. *Id.* at 967–69.

■ "[A]buse of discretion review, with any 'conflict ... weighed as a factor,' ..., is indefinite." *Id.* (citation omitted). The district court must tailor the intensity of its review to fit the circumstances before it. *See id.* at 968–69.

> The level of skepticism with which a court views a conflicted administrator's decision may be low if a structural conflict of interest is unaccompanied, for example, by any evidence of malice, of self-dealing, or of a parsimonious claims-granting history. A court may weigh a conflict more heavily if, for example, the administrator provides inconsistent reasons for denial, ...; fails adequately to investigate a claim or ask the plaintiff for necessary evidence, ...; fails to credit a claimant's reliable evidence, ...; or has repeatedly denied benefits to deserving participants by interpreting plan terms incorrectly or by making decisions against the weight of evidence in the record.

*Id.* (citations omitted). The district court may also consider "evidence that any conflict did not influence [the administrator's]

decisionmaking process," *e.g.*, "that it used . . . [an] independent review process; that its employees do not have incentives to deny claims; that its interpretations of the plan have been consistent among [claimants]; or that it has minimized any potential financial gain through structure of its business." *Id.* at 969, n. 7. In determining how much weight to give a conflict under the abuse of discretion standard, the district court may look outside the administrative record. *Id.* at 970.

▮ In the present case, there is little question that the Plan's language was designed to confer the broadest discretion imaginable on First Health to interpret its terms and make benefit eligibility determinations. As noted earlier, the extent of this extensive power is best illustrated by the following passage:

If, due to errors in drafting, any Plan provision does not accurately reflect its intended meaning, . . . as determined by the Plan Administrator in its sole and exclusive judgment, the provision will be considered ambiguous and will be interpreted by the Plan Administrator in a fashion consistent with its intent, as determined by the Plan Administrator in its sole discretion.

*See* DSOF (doc. # 24), Ex. 2 at 6. First Health's discretion under the Plan is clearly sufficient for the Court to apply abuse of discretion review, but also appears to invite potential abuse with its liberal allowance of ambiguities as an avenue for unilateral plan modification.

Plaintiff suggests that the Court should apply de novo review, because she was allegedly never shown the Plan until after she was terminated, and therefore could not have agreed to the Plan Administrator's broad discretionary powers. Resp. (doc. # 25) at 6–7. Given that Plaintiff was at least aware of the Plan's schedule of benefits while she was still employed by First Health, as evidenced by her March 18 email to Zambrano, the Court cannot accept her position, and will apply abuse of discretion review.

However, the Court will temper its deference to First Health's decision on account of the structural conflict of interest inherent to its dual capacity as plan fiduciary and administrator. *Id.* at 7–9. Plaintiff argues that the Court should weigh this conflict more heavily due to the inconsistent reasons she was given by First Health for the denial of her director-level benefits. *Id.* at 8. The point is well taken. Plaintiff was a "person with the title of Director" who was not "classified as 'non-supervisor' in the Colleague Data Base," and by the plain meaning of the Plan would appear to have been entitled to director-level severance benefits. *See* DSOF (doc. # 24), Ex. 2 at 5. Instead of focusing on those considerations set forth in the Plan, the Committee's reasons for its denial of Plaintiff's director-level benefits focus on other irrelevant details such as insider trading agreements, blackout periods, and Flexible Time Off. DSOF (doc. # 24), Ex. 11. The Committee apparently did so because, "in it its sole and exclusive judgment," it determined that "errors in drafting" caused the Plan's schedule of benefits to "not accurately reflect its intended meaning," and required the schedule to be "considered ambiguous" and reinterpreted "in its sole discretion" as follows: "The Plan language indicates the intent to differentiate between the level of benefits awarded to a person acting at a director level with a director title and someone who merely has the word 'director' in their title." DSOF (doc. # 24), Ex. 2 at 6, Ex. 11. Absent the Plan provision which purports to allow First Health to create such ambiguities out of otherwise clear terms for the sole purpose of reinterpreting the Plan consistent with its later determined intent, the Court perceives no such intent in the Plan documents. More-

over, First Health acknowledges that the National Sales Director and Product Director—positions expressly excluded from director-level benefits under the Plan—were both subject to stock restrictions, yet later attempted to deny Plaintiff on the basis that she was not subject to those same restrictions. *See* Reply; DSOF (doc. # 24), Ex. 11. It suffices to say that First Health's reasons for denying eligibility have been inconsistent. The Court undertakes its abuse of discretion review.

## B. Whether First Health Abused Its Discretion

██ An ERISA plan administrator abuses its discretion if (1) it renders a decision without any explanation, (2) it construes provisions of the plan in a way that conflicts with the plain language of the plan, or (3) it relies on clearly erroneous findings of fact in making benefit determinations. *Taft v. Equitable Life Assurance Soc'y*, 9 F.3d 1469, 1472–73 (9th Cir.1993). Because an administrator cannot abuse its discretion by failing to consider evidence that was never before it, the Court's review is limited to evidence that was part of the administrative record. *See id.* at 1471–72.

██ It is apparent to the Court that there are at least genuine issues of material fact from which a rational trier of fact could determine that First Health abused its discretion in denying Plaintiff director-level benefits under the Plan. Although the Court has determined that the abuse of discretion review in this case must be undertaken with a good measure of skepticism, these triable issues would exist even in the absence of such heightened review.

First Health has arguably abused its discretion by construing the provisions of the Plan in a way that conflicts with its plain meaning. *Taft*, 9 F.3d at 1472–73. The plain language of the Plan provides that "persons with the title of Director or titles above Director" are eligible for the subject benefits. DSOF (doc. # 24), Ex. 2 at 5. Although the primary criteria of eligibility is defined in terms of the prospective beneficiary's title, the Committee's denial letter to Plaintiff suggests the opposite—that the real purpose of the Plan was to "differentiate between . . . a person acting at a director level with a director title and someone who merely has the word 'director' in their title." DSOF (doc. # 24), Ex. 11. Moreover, an explanatory footnote in the Plan refining the eligibility criteria notes that directors classified as "non-supervisor" in the Colleague Data Base are ineligible for director-level benefits. DSOF (doc. # 24), Ex. 2 at 5 n. 1. Plaintiff was a director whose position was *not* classified in the database as "non-supervisor," yet she was denied for other reasons obviously not contemplated by the plain language of the Plan. Furthermore, the Court does not know what to make of First Health's contention that it has no obligation to show prospective beneficiaries the Colleague Data Base, *see* DSSOF (doc. # 30) ¶ 2, when it claims that the classifications in that database are "controlling" in determining benefit eligibility. *See* DSOF (doc. 24), Ex. 11. It may simply reflect a belief that a prospective beneficiary's full and accurate understanding of the bargain reflected in the Plan documents is immaterial and unnecessary given First Health's broad discretion to alter those terms at any later date based on what is contended to be an ambiguity.

In defense of its motion, First Health makes much of the fact that the illustrative examples it selected for the explanatory footnote in the Plan—Medical Director, National Sales Director, or Product Director—like Plaintiff's position, were actually classified in the database as "managers," not "non-supervisors." Reply (doc. # 29) at 2–4, 8. It therefore argues that its choice of examples creates an ambiguity

requiring interpretation. Curiously, however, First Health's interpretation imbues mere examples in a footnote with more determinative weight than the substantive phrases they were meant to illustrate. This unusual manner of interpretation is insufficient to dispel the genuine issues of material fact concerning the question of whether First Health abused its discretion in denying Plaintiff benefits.

■ First Health's interpretive efforts have strained the plain meaning of the Plan. As the Court alluded above, the Plan's eagerness to confer sweeping discretion on the administrator nearly invites such abuse by allowing the administrator, "in its sole and exclusive judgment," to cure "errors in drafting" by unilaterally "consider[ing] [them] ambiguous," and reinterpreting them "in a fashion consistent with its intent, as determined by the Plan Administrator in its sole discretion." DSOF (doc. # 24), Ex. 2 at 6. This free license to unveil the Plan's hidden meanings by rewriting its terms is offensive to contractual principles of mutual assent and impermissible under ERISA. *See Saffle v. Sierra Pac. Power Co. Bargaining Unit Long Term Disability Income Plan,* 85 F.3d 455, 460 (9th Cir.1996) ("[A]n administrator lacks discretion to rewrite the Plan.").

## IV. CONCLUSION

In light of the foregoing analysis,

IT IS ORDERED that Defendants' motion for summary judgment (doc. # 23) is DENIED.